UNITED STATES DISTRICT COURT
For the District of New Jersey

ORGANIC PAGANS, :

              Plaintiffs,   :

     V.                 :         Civil No.: _____

NEW JERSEY, PHIL MURPHY, CHRIS CHRISTIE,      :

GARY LANIGAN, MARCUS HICKS, MICHELLE    :

RICCI, STEPHEN D'LLIO, STEVEN JOHNSON,  :

RASUL SALUKI, WARREN WILCOX, JOHN DOE,  :       COMPLAINT

THE UNITED STATES OF AMERICA, RUTGERS,  :

DAVE HOFFMAN, and JPAY, :

              Defendants    :      Jury Trial Demanded

1. This is a civil-action complaint brought forth by Frank Castaldo, who is an Organic Pagan.  Throughout this complaint, Frank Castaldo represents approximately forty Organic Pagans in the New Jersey prison system and six Organic Pagans outside of prison.  Frank Castaldo is presently incacerated at East Jersey State Prison.  Collectively, Frank Castaldo, some forty Organic Pagans living in the New Jersey Department of Corrections system, and six Organic Pagans living outside the New Jersey Department of Corrections are referred to hereinafter as "Plaintiffs."

2. Plaintiffs assert jurisdiction pursuant to 42 U.S.C. § 1983, the RLUIPA, the RFRA, pendant jurisdiction, and any other available authority.  Plaintiffs seek punitive,

1

compensatory, nominal, declaratory, and injunctive relief, and a temporary restraining order.

3. Defendant Number One is THE STATE OF NEW JERSEY. Defendant Number One is involved in this case as a result of not recognizing Plaintiffs' religion and creating substantial burdens on Plaintiffs who long to practice their religion.

4. Defendant Number Two is PHIL MURPHY, whose official position  is Governor of the state of New Jersey since January of 2018.  Defendant Number Two is involved in this case as a result of having acted in his individual capacity and official capacity, and under color of state law, by instituting/approving policies and procedures to cause, and/or being deliberately indifferent to conditions and significant religious burdens and deprivations caused to and placed on Plaintiffs from May of 2018 until present, as described in this complaint.

5. Defendant Number Three is CHRIS CHRISTIE, whose official position was Governor of the state of New Jersey prior to January of 2018.  Defendant Number Three is involved in this case as a result of having acted in his individual capacity and official capacity, and under color of state law, by instituting/approving policies and procedures to cause, and/or being deliberately indifferent to conditions and significant religious burdens and deprivations caused to and placed on Plaintiffs prior to May of 2018 until present, as described in this complaint.

6. Defendant Number Four is GARY LANIGAN, whose official position was Commissioner of the New Jersey Department of

2

Corrections ("DOC") until the spring of 2018. Defendant Number
Four is involved in this case as a result of having acted in
his individual capacity and official capacity, and under color
of state law, by instituting/approving policies and procedures
to cause, and/or being deliberately indifferent to conditions
and significant religious burdens and deprivations caused to
and placed on Plaintiffs, as described in this complaint.

7. Defendant Number Five is MARCUS HICKS, whose official
position was Chair of the Religious Issues Committee ("RIC")
until the spring of 2018, and whose present official position
is acting Commissioner of the DOC since the spring of 2018.
Defendant Number Five is involved in this case as a result of
having acted in his official capacity and individual capacity,
under color of state law, by instituting/approving policies
and practices to cause, and/or being deliberately indifferent
to conditions and significant religious burdens and deprivations
caused to and placed on Plaintiffs as described in this
complaint.

8. Defendant Number Six is MICHELLE RICCI, whose official
position is acting member of the RIC for the DOC and designee
for the Commissioner of the DOC for all times relevant to the
claims listed in this complaint. Defendant Number Six is
involved in this case as a result of having acted in her
individual capacity and official capacity, and under color of
state law, by instituting and/or approving policies and practices
to cause, and/or being deliberately indifferent to others under

3

her control causing Plaintiffs to suffer from the claims listed in this complaint.

9. Defendant Number Seven is STEPHEN D'LLIO, whose official position is and/or was an acting member of the RIC and is Assistant Commissioner of the DOC for all times relevant to the claims listed in this complaint. Defendant Number Seven is involved in this case as a result of having acted in his individual capacity and official capacity, under color of state law, to cause, and/or having been deliberately indifferent to others causing the conditions and burdens described in the claims listed in this complaint.

10. Defendant Number Eight is STEVEN JOHNSON, whose official position was Administrator of New Jersey State Prison ("Trenton" or "NJSP") up until the summer of 2018. Defendant Number Eight is involved in this case as a result of having acted in his individual capacity and official capacity, under color of state law, by having instituted/approved policies and practices that caused, and/or having been deliberately indifferent to the policies, practices, and actions that caused the Plaintiffs to suffer the conditions and religious burdens described in the claims listed in this complaint.

11. Defendant Number Nine is Rasul Saluki, whose official position was an acting member of the RIC for the DOC and head Chaplain for NJSP prior to the end of 2015 and/or beginning of 2016. Defendant Number Nine is involved in this case as a result of having acted in his individual capacity and official

4

capacity, under color of state law, to cause, and/or having been deliberately indifferent to the conditions and religious burdens described in the claims listed in this complaint.

12. Defendant Number Ten is WARREN WILCOX, whose official position is an acting member of the RIC for the DOC and head Chaplain for NJSP after the end of 2015 and/or beginning of 2016. Defendant Number Ten is involved in this case as a result of having acted in his individual capacity and official capacity, under color of state law, to cause, and/or having been deliberately indifferent to the conditions and religious burdens described in the claims listed in this complaint.

13. Defendant Number Eleven is JOHN DOE, whose official position is a staff member of Religious Services at East Jersey State Prison ("EJSP") and/or Chaplain during the spring/summer/fall of 2018. Defendant Number Eleven is involved in this case as a result of having acted in his individual capacity and official capacity, under color of state law, and with malice to cause, and/or having been deliberately indifferent to the claims listed in this complaint, and by having threatened retaliation and then retaliated against Plaintiffs as described in this complaint.

14. Defendant Number Twelve is the UNITED STATES OF AMERICA. Defendant Number Twelve is involved in this case as a result of having instilled and selectively upheld or enforced laws, rules, policies, and procedures that caused deprivation of religious rights and denial of equal rights to Plaintiffs as

5

described in this complaint.

15. Defendant Number Thirteen is RUTGERS, who provides health care to prisoners within the D^C. Defendant Number Thirteen is involved in this case as a result of having acted under color of state law and as an individual organization to instill practices and policies that caused, and/or being deliberately indifferent to the denial of religious rights, denial of medical treatment, and the resultant suffering described in this complaint.

16. Defendant Number Fourteen is DAVE HOFFMAN, whose official position was Engineer and head of the Repair Shop and Maintenance at NJSP up until the spring of 2017. Defendant Number Fourteen is involved in this case as a result of having acted in his individual capacity and official capacity, under color of state law, to cause, and/or having been deliberately indifferent to the conditions and religious burdens described in the claims listed in this complaint.

17. Defendant Number Fifteen is JPAY, who provides a tablet, kiosk system, entertainment, and access to the DOC's grievance system for prisoners in the New Jersey prison system. Defendant Number Fifteen is involved in this case as a result of having acted in its individual and/or official capacities, under color of state law, to cause, and/or having been deliberately indifferent to the causes described in the claims listed in this complaint.

6

18. Plaintiffs previously sought informal and formal relief
from appropriate officials by submitting letters and inquiry,
grievance, and appeal forms and kiosk entries to the
administration and complaining verbally and in writing to the
defendants at the prisons, attempting to call the ombudsman,
sending letters to the ombudsman, filing Notice of Tort Claim
forms, writing the DOC Commissioner, sending formal complaints
to the state Governors and their affiliates, petitioning the
United States Government for Religious Exemption and Recognition,
and having loved ones and spiritual leaders call and mail letters
and attachments to the DOC's Commissioner, acting Commissioner,
the Administrators of NJSP and EJSP, members of the Religious
Issues Committee, Lt. Governor, and Governor.

19. Paragraphs 1 through 18 are incorporated as if set
forth in full throughout this Complaint.

20. Within the state of New Jersey, its DOC, and the United
States of America, Defendants One through Twelve have deprived
Plaintiffs of all necessary means of safely and legally
practicing or expressing their sincerely held religious beliefs
as Organic Pagans, which is a class of pagans that includes
but is not limited to Organic Odinists, Organic Odians and
Godians, Organic Asatruer, Organic Heathens, Global Shamans,
Guardians of Diversity, Pagan Buddhists, Organic Heathens, Allied
Kindred, Organic Hindi, Organic Shintoists, Organic Shaivites,
Organic Wiccans, Organic Druids, Organic Native Americans,
Organic Indo-European Americans, and Organic Inward Eighters.

7

Within the DOC, there are over five hundred known pagan inmates, and some forty of them identify as Organic Pagan Prisoners, who are distinguished from ordinary pagans as described in the following paragraphs about Organic-Pagan beliefs.

21. Plaintiffs in this case sincerely believe that they must perform all the rites listed in this complaint and appendix, and all rites listed in the various pagan publications on Organic Pagan Rites, which Plaintiffs are currently not allowed to perform. Plaintiffs believe failing to perform these rites at specific times and in specific ways will result in cosmic chaos and personal spiritual failure. Plaintiffs claim that the Defendants listed in this complaint, as well as any who can be identified and named after discovery, have 1) prevented Plaintiffs from practicing their religion in violation of the First Amendment to the Constitution of the United States as described in this complaint, 2) have created significant religion-related burdens on Plaintiffs in violation of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") as described in this complaint, 3) have deprived Plaintiffs of equal protection of the law in violation of the Fourteenth Amendment to the Constitution of the United States and RLUIPA as described in this complaint, 4) have subjected Plaintiffs to cruel and unusual punishment in violation of the First Amendment to the Constitution of the United States; Plaintiffs also claim that said Defendants have violated Plaintiffs' rights as described in this complaint under the

8

protection of supplemental and/or pendant jurisdiction in violation of the New Jersey Constitution, the New Jersey Torts Claims Act, and the religious and equal-protection rights guaranteed therein.

22. Plaintiffs are animists who believe they are part of all living things in the circle of life within Nature, and as such they must perform specific shamanic rites to help participate in keeping the cosmos in proper order; these rites include but are not limited to ritually preparing for and performing six daily sun-wheel-turning rituals (at least one of which must be performed outdoors), eight moon-maintenance rites each month (with two being performed indoors every fortnight on the new moon and full moon, and the other six being performed outdoors), and eight outdoor seasonal sun-wheel-turning rites each year.

23. Plaintiffs believe they have to observe daily outdoor worship in the name of each of the days of the week that have been named after the pagan deities: Sun's Day, Moon's Day, Tyr's Day, Woden's Day (or Odin's Day, or Godin's Day), Thor's Day, Frigga's Day (and Frey and Freya's Day), and Saturn's Day. Each of these days has its own rites geared toward its designated deity or deities, and each day has specific deities within it who represent the stations of the day when different rites must be performed in order to keep the cosmic order in rotation. Honoring these deities requires specific rituals, including rune yoga postures, that cannot be done in a cell that lacks

9

the room needed and contains impurities from an open toilet,
cannot be done without a rune-yoga mat, meditation mats, pillows,
and cushions, and cannot be done without the presence of the
other items and conditions listed in this complaint and the
referenced Organic Pagan literature. For Organic Odian members
of the Plaintiffs, the sun must be greeted outdoors at least
one time a day for six of the days of the week, but on Woden's
Day, the entire day must be devoted to Outdoor One-Harrier rites
that begin with morning Ragnarok Exercises (resistance training);
every Woden's Day must end with an indoor Congregate Sumble
service followed by personal research meditation rituals; every
Sun's Day must include greeting the sun at dawn, saluting her
at noon, and bidding her good-night at dawn; and every Moon's
Day must include an outdoor greeting to the moon after sunset
(preferably in the outdoors, but the alternative of performing
the rite through glass in darkness has been suggested by
incarcerated Plaintiffs, who are more than willing to adjust
to security concerns when said concerns are legitimate).

24. The eight yearly outdoor sun-wheel-turning holy day
ceremonies that must take place on precise dates for the Winter
Solstice (approximately December 21st), the Spring Turning
(February 1st), the Spring Equinox (approximately March 21st,
but falling on the 20th in 2019), the Summer Turning (May 1st),
the Summer Solstice (approximately June 21st), the Summer Turning
(August 1st), the Fall Equinox (approximately September 21st,
but falling on the 22nd in 2018 and the 23rd in 2019), and Winter

10

Turning (November 1st). These rites must be performed outdoors, and they must take place over the course of two days, with the main rite taking place on the precise date of the solar event.

25. Performing these rites requires specific seasonal plant and animal foods and drinks, and specific items that Plaintiffs are not currently permitted to possess or use, including but not limited to corresponding plants foods that begin as parts of living plants and are then ceremoniously chosen (via rune castings), harvested, and turned into bannocks, bread-beasts, and animal crackers that must be sacrificed in lieu of animals on each sun blot. Each sacrifice must contain specific foods, drinks, colors, images, scents, sounds, activities, and textures that correspond to the meanings of each Blot and the season or seasons in which each Blot takes place. All people who attend the rite are required to bring at least three types of token offerings to be used in the rite; the offerings must consists of a form of food or drink, a form of art, and some type of seasonally appropriate craft.

26. For each of the daily, weekly, monthly, and seasonal turning points in the sun wheel and the moon phases, the Laws of Correspondences must be applied. Each holy tide's specific traditions, decorations, songs, and food and drink offerings are key factors in these daily rituals and seasonal sun-wheel-turning and monthly moon-maintenance ceremonies. At least one of the daily rites must take place outdoors, and offerings must be ceremoniously brought out for the Nature

deities (also referred to as Nature Spirits, Land Spirits, and Land Wights) every day.

27. Plaintiffs believe they must protect the goddess Jorth (the earth) by consuming and/or using only organic foods and water, and by using only natural soaps, detergents, clothing, ritual items, bedding, and other natural products. No accommodations are made for Plaintiffs in the DOC.

28. Plaintiffs believe they must create and maintain physical and metaphysical hygiene with specific organic purification rites for their sanctuary areas and items through the use of items and products that include but are not limited to vinegar, iodine, distilled water, sea salt, fire. incense, oils, safe oral hygiene products such as dental floss and baking soda. and hydrogen peroxide. None of these items are permitted, and no access to them is granted.

29. Plaintiffs believe they must perform herbal-medicine and plant-magic rituals and avoid all forms of unnatural medical practices. None of this is permitted for Plaintiffs in the DOC, and the opposite is often forced through mandatory TB tests, X-rays, blood tests, prescriptions, etc.

30. Plaintiffs believe they must maintain natural indoor and outdoor gardens and have sanctuaries that consist of a World Tree, a Sacred Well, a Sacred Fire, a Sacred Library and Study area, spaces for private quiet meditations, and an exercise area. Despite that there are garden areas in almost all of the prisons and a greenhouse in EJSP. and indoor plants in all

12

prisons, Plaintiffs in the prison system are not allowed to have plants or access to plants, even though they can be around the plants from other religions that don't require plants.

31. Plaintiffs believe they cannot consume any foods or water that have been contaminated with synthetic chemicals, and they cannot have their plant foods heated above 117 degrees or prepared more than three hours prior to being consumed. No access to organic foods or spring water is available, and no meal accommodations are made. Furthermore, no medical treatment is provided for the nutritional deficiencies that result from the lack of organic foods and the dehydration produced by the Plaintiffs being prevented from having a natural and organic diet.

32. Plaintiffs believe some of their ritual and ceremonial meals must be maid up of exclusively liquid plant foods that cannot be prepared with any containers or utensils that have ever been in contact with any animal products. Ritual food preparation and other such considerations are permitted for Jewish, Christian, and Muslim prisoners, but not for Plaintiffs.

33. Plaintiffs believe they must keep living plants and other members of their Nature Congregation around them at all ti es and they believe they must meditate with living plants and other members of their Nature Congregation several times a day, including but not limited to plant presence during sleeping rituals and the practice of morning exercises (such as rune yoga), which require a mat and a cushion directly next

13

to plants and direct sunlight, none of which is permitted,
despite that Native American prisoners can go outdoors for
services and Muslim inmates can have prayer mats in their cells
and entire areas covered with rugs for services.

34. Plaintiffs believe they must feed, raise, hunt, fish,
trap, and gather seasonal foods to perform their rites.  They
are deprived of all access to any of this in the DOC and on
parole or probation.

35. Plaintiffs believe they must perform daily
mirror-scrying rituals.  Prison Plaintiffs are often not
permitted to have flexible mirrors, despite that they pose no
risk in Administrative Segregation ("ad seg").

36. Plaintiffs believe they must perform rites that involve
the complete production and absorption of "Sacred Substances"
often described as "mead" and "Soma," but meaning all forms
of natural plant products that range from tobacco and teas to
alcohol and cannabis, which have been discovered and used as
part of global-shaministic rites for hundreds and sometimes
thousands of years.

37. Plaintiffs believe they must use specific ritual and
ceremonial items that include but are not limited to: a mortar
and pestle; a blender; offering bowls; spoons; ladles; cauldrons;
rune staves; rune tiles; rune stones; and rune cards; casting
cloth; altar made of stone or wood; altar cloth; stools made
of wood; musical instruments (minimally a stringed instrument,
drum, flute, and bell); colored candles; cloak; soil; sea salt;

14

yeast; fresh and natural spring water; herbs; spices; oils; incense; Troth Rings (for fingers and for ceremonial use); Arm Ring (for upper arm): Thor's Hammer to wear and Thor's Hammer for ritual use: Sacred Substances, (including but not limited to fermented and distilled beverages, tobacco, and cannabis); pipe; feathers; fresh twigs, branches and leaves; nuts; seeds; grains; fruit; roots, vegetables; berries; mushrooms; buds; fire-starting kit; medication beads; art supplies. Plaintiffs in the DOC are permitted at best to possess only a personal Thor's Hammer, but they must go against their beliefs by hiding it under their shirts, whereas other religious symbols for other prisoners can be displayed, and other prisoners of other faiths are permitted to have identical if not comparable items/products/access for their religions.

38. Plaintiffs believe they must create and use ritual and ceremonial musical items with natural materials. This is not permitted for Plaintiffs in the DOC, though it is permitted for members of the Christian religion, who are given various times to use musical instruments in all the prisons, are allowed to possess them in their cells in EJSP without a waiting period, and are allowed to play in a band and have a band play during various Christian services.

39. Plaintiffs believe they must produce ritual art every day with natural materials, but can rarely do so in the DOC.

40. Plaintiffs believe they cannot share living space or sacrifice space with anyone who fails to perform the

Organic-Pagan form of physical and metaphysical hygiene, or anyone who practices any form of anti-pagan supremacism and/or intolerant religions or wears any hate symbols including but not limited to Christianity and the crucifix, and any other religion and symbol that have been used to suppress and/or destroy Organic Paganism and/or torture and kill its adherents.

41. Plaintiffs in the DOC are forced to live with others in cells where Plaintiffs cannot perform any form of religious rites due to inmates in the cells having different hygiene practices and/or a lack thereof, performing contrary religious practices, displaying anti-pagan hate symbols and listening to and singing anti-pagan religious music that is offensive and prevents Plaintiffs from being able to have a ritually pure area or being able to concentrate during any attempted meditation or ritual studying. Members of other religions who have been subjected to hate symbols, speech, and music are not forced to endure such a religiously hostile and offensive environment. Defendants Four through Seven do not allow for Plaintiffs to be moved to single cells or choose fellow Organic Pagans to lock with, and they are subjected to long periods where they are forced to live in such religiously hostile environments, sometimes without being able to leave the cells for weeks at a time during lock downs and for longer periods.

42. Plaintiffs believe they must participate in religious games of chance for ritual purposes, but this is prevented in DOC, or outlawed and/or too costly and difficult for Plaintiffs

16

to do outside DOC.

43. Plaintiffs believe they must practice certain rites that require them to participate freely and in a religiously appropriate manner in such things as birth, naming, coming of age, sexual education, stimulation, and gratification, marriage, divorce, land management, death and funerals. These rites are not honored in any way by Defendants One through Thirteen.

44. Plaintiffs believe they must never use money to purchase anything related to their religious rites, or otherwise have religious rites associated with money, but they are prevented by Defendants One through Eleven from creating their own religious items or performing rites that allow them to practice their sincerely held beliefs without the use of money.

45. Plaintiffs believe they must perform ritual baths in areas that are not used by anyone who does not belong to their religious communities. Plaintiffs in the DOC are not given the ability to have ritual baths and instead must shower in areas where other people's waste gets splashed all over Plaintiffs and their clothes, and there are no areas to keep clothes so they are not splashed in the shower areas, where there is no space for hanging clothes or placing shower items.

46. Organic Pagan Plaintiff in the DOC are not given access to the herbs and spices necessary to perform ritual baths.

47. Plaintiffs believe they must fast during specific periods, some of which must be determined by rune castings. These fasts are not honored and scheduling and urine tests often

17

interfere with the fasts and force Plaintiffs to break the fasts
to avoid being given institutional charges.

48. Plaintiffs believe their ritual areas must never be located
near toilets or in areas where human waste can be splashed. Toilets
in the prisons do not have lids and are inches away from the bunks,
and bodily waste is sprayed all over the cells and Plaintiffs in
the DOC when the toilets are flushed.

49. Plaintiffs believe they must never excrete their bodily
waste in front of any other human. This sincerely held belief cannot
be honored in the DOC where Plaintiffs are forced to double lock
and forced to urinate in front of staff members instead of being
checked and placed in privacy for urine tests.

50. Plaintiff often must choose between recreation and mess
movements or yard movements in the DOC because Plaintiffs Four
through Eight and Defendant Thirteen schedule Plaintiffs for passes
and other appointments that conflict with recreation and mess
movements.

51. Plaintiffs believe they must never choose non-religious
activities over religious activities, but they are often required
to go on passes to medical and other areas within the DOC because
Defendants Four through Eight and Defendant Thirteen often schedule
Plaintiffs for passes and other appointments that conflict with
Plaintiffs' personal religious obligations and study groups and
feast call outs.

52. Plaintiffs believe they must never submit to the authority
of any specific spiritual leader without having the freedom to

19

practice their beliefs according to individual preferences.

53. Some Organic Pagans, including most of the Plaintiffs within the DOC, believe they must perform certain rituals that prevent their intense meditation rituals from being interrupted from the existence of scents and impurities that are trapped in hair and under finger nails and toenails. As such, those Plaintiffs believe they must shave their heads and most of their facial hair every day, cut their finger and toenails every day, and keep only eyebrows and a shortly groomed goat-tee at most on their heads/faces. Plaintiff in the DOC are not able to perform these rites, and often can't groom themselves for weeks, months. and even years in ad seg.

54. Plaintiffs within the DOC have not been given the space, time, considerations, equal treatment, or items necessary to perform any of the aforementioned rites or to otherwise express and/or practice any of their sincerely held beliefs as described in their publications. In nearly every instance, Plaintiffs have proposed alternatives to any potential security concerns, but the Defendants have categorically denied all of the requests with boiler-plate language about security concerns or by ignoring any requests.

55. Defendants One through Eleven have failed to allow, and/or been deliberately indifferent to others failing to allow Plaintiffs to practice and/or express all of the aforementioned sincerely held beliefs by way of failing to allow Plaintiffs to observe these rites and otherwise practice/express their sincerely held beliefs.

56. The DOC has religious books within their libraries and chapels for nearly every religion, but none for any pagans. Funds

20

and resources are used for the purchase and maintenance of these religious books, but no such equal treatment is provided for literature about Plaintiffs' beliefs, despite that Plaintiffs have donated their own literature several times, which was not displayed and has gone missing.

57. Plaintiffs believe they must become organic vegans during certain periods (especially during the month of November), and some believe they must maintain an organic vegan lifestyle at all times except during holy day feasts when ritual animal foods are necessary, but this is not possible to any extent for Plaintiffs within the DOC. No organic foods or beverages are provided or permitted, and there is no way to maintain proper nutrition as a vegan even on the vegetarian diet which is set up for Muslims and is the only alternative that was ever given to any of the Plaintiffs in the DOC. Aside from not being organic, not being prepared according the Organic Pagan laws for separating containers and utensils for plant and animal foods, and not containing foods that are served within three hours of preparation, the Muslim diet provided to vegan Plaintiffs in the DOC contains eggs, cheese, milk, and various other dairy products that have no actual vegan protein replacement. In contrast, the entire commissary and regular diet within the DOC conform to the Jewish and Islamic religious rules regarding not having pork, and conform to the Christian diet of having fish on Fridays. There is not a single beverage or food items sold or provided that is organic and/or natural, within three hours of preparation, or otherwise fit for Organic Pagans to drink or eat.

Plaintiffs have offered the alternative of paying for their own meals and ritual offerings until there is a ruling from the Religious Issues Committee about organic foods, a vegan diet, and natural ritual offerings, and Plaintiffs have even agreed to limit their food and drink purchases to only the vendors who are already approved by the DOC for food package orders and other source-of-sale orders that have been previously approved, but this has also been verbally denied and ignored on paper by the Defendants. The DOC allows all prisoners who are charge free for a year to order food packages twice a year, allows prisoners who are not charge free to order smaller food packages twice a year, and allows prisoners entered into the STEP school programs to order and receive extra incentive food packages two more times per year. Muslims are allowed to have special foods every night of their month-long fast and during their additional holy day meals throughout the year, and Jewish inmates are provided with sealed Kosher trays three times a day. There is no security concern and no financial concern with allowing Plaintiffs within the DOC to order and receive organic foods and drinks from approved vendors until there is a ruling as to what foods and drinks will be provided for Plaintiffs who sincerely believe they must maintain an organic vegan diet of raw plant foods and drinks that have been prepared within three hours of being consumed, and Plaintiffs who believe their aforementioned sacrifices must consist of living organic foods and drinks.

   58. Defendants One through Eleven have failed to allow, and/or been deliberately indifferent to others failing to allow Plaintiffs

to practice and/or express their sincerely held beliefs by way of ruling that Plaintiffs cannot have any Sumble, Blot, or other "worship" unless there is a volunteer from the free world who will be approved, come into the prison, and oversee the services.

59. Plaintiffs in the DOC rarely have any spiritual leaders who are located near the prison, able to be approved and/or are willing to come into the prisons, so Plaintiffs in the DOC are being deprived of services as a result of being a minority religious group. The DOC's Internal Management Procedures ("IMP") for religious services state that "Congregate services must be supervised by the Chaplain or an approved volunteer," but the Chaplain at EJSP (Defendant John Doe) will neither supervise any Indo-European pagan services nor instruct one of the other approved volunteers to do so, despite that the Chaplain supervises other services and instructs other volunteers to supervise other services. Defendants Two through Eight have been and/or still are deliberately indifferent to these deprivations and disparate treatment.

60. The Native Americans at EJSP have congregate worship services outdoors near the chapel every Friday morning, and they are supervised by the Chaplain and/or other volunteers who are not Native American, and they are permitted to smoke tobacco near living plants and on grass outside the EJSP chapel once a week, without a Native American volunteer coming from the outside world.

61. Thus, Defendant John Doe refuses to do what he is obligated to do according to the existing IMP for Odinists/Asatru Plaintiffs and Wiccan Plaintiffs, he refused to allow candles, flames, and

23

tobacco for said Plaintiffs but allows them for others faiths, and
he refuses to allow services to be conducted outdoors for said
plaintiffs but allows them for Native Americans, and he allows plants
for other groups (both indoor and outdoor) but not for Plaintiffs.

62. Defendants One through Eight have been and/or are still
deliberately indifferent to the aforementioned actions and inactions
of Defendant Number Eleven.

63. In violation of Plaintiffs' rights to equal protection,
Defendants One through Eleven have allowed members of the Jewish,
Christian, and Islamic faiths, but have not allowed Plaintiffs to
observe holiday rituals that take place according to specific times
within the celestial calendar and with specific foods, including
dates to break Islamic fasts, fish on Fridays for Christians, and
no pork sold or served.

64. Defendants One through Eleven prevented Plaintiffs from
possessing watches or other time-keeping devices that are needed
in order for the rites to be conducted on time. Watches are not
permitted in some places, and cannot be purchased on Level-1 in
ad seg ("ad seg"), and there is no way to quickly replace broken
watches or dead batteries, so even if the watches are available,
long periods  without the ability to perform daily rites on time
take place.

65. Defendants One through Eleven know but ignore that
Plaintiffs in the DOC require hot water for ritual purification,
but it is not available at necessary times and in some instances
not available at all for weeks, months, and years at a time in ad

24

seg.   Additionally, accommodations for hygiene practices in other
faith groups are made, including pork-free products, but no natural
sanitation and hygiene products are provided or allowed to be
purchased and retained by Plaintiffs.

66. From winter to fall of 2018, Defendant Number Eleven
deprived Plaintiffs of any IMP approved religious services at EJSP,
gave them inappropriate "feasts" only four times a year on the wrong
solar dates, and denied them equal treatment of weekly and outdoor
services, weekly band practice and musical equipment access, and
necessary daily, monthly and seasonal ceremonies, and otherwise
subjected them to disparate treatment.  He also retaliated against
Plaintiffs by threatening to and then canceling pagan call outs,
changing Godian services to a study group, having cells searched
and religious literature seized, having approved items/books never
obtained, and having some Plaintiffs moved to unfavorable places
within the prison and mixed with contrasting groups on improper
dates and improper areas with no access to necessary items if they
mention him in any more complaints, inquiries, grievances, and
appeals (after they did so again, his threats were carried out as
stated).  He then threatened to worsen his retaliation by having
some Plaintiffs shipped out of EJSP and/or locked up on trumped-up
charges.  All of this has resulted in some Plaintiffs 1) no longer
or not going to study groups and solstice and equinox gatherings
2) no  longer or not writing up not having services/items, and 3)
not being given equal access to items, outdoor areas, musical
equipment and practice time, etc.

67. Despite full exhaustion of all available remedies and additionally being notified in other ways, Defendants One, Two, Three, and Twelve have not allowed for equal or any other form of legal exemption for Plaintiffs to produce, possess, use, and share any "Sacred Substances" that are required for Plaintiffs' rites, including rites that require the production, possession, use, and exchanging of alcohol, distilled spirits, cannabis, certain mushrooms, and tobacco, especially with respect to the Plaintiffs who are incarcerated or have been incarcerated and paroled, and all Plaintiffs who cannot use money to perform these rites.

68. Despite several requests and full exhaustion of all available remedies and additionally being notified in other ways, Defendants One, Two, Three, and Twelve have not allowed for equal or any other form of legal exemption for Plaintiffs to produce, possess, use, and share any form of hunting, fishing, and trapping items and rites, especially with respect to the Plaintiffs who have been convicted of felonies, but also with respect to all Plaintiffs who cannot use money to pay for the ability to perform these rites.

69. Defendants One and Twelve have used archaic laws and refused to acknowledge new evidence that shows cannabis is not dangerous, has medicinal benefits, and should not be treated as a schedule-One drug, which has resulted in Plaintiffs not being able to freely use it for ritual purposes, which additionally results in the denial of medical treatment and has resulted in several of the Plaintiffs suffering from pain and depression that would otherwise be treated according to the restrictions of their sincerely held beliefs.

70. Defendants Thirteen and One refused to allow Plaintiffs in the DOC to be treated with medical marijuana and refused to allow for Plaintiffs in the DOC to be given alternative medical treatment and attention that does not require Plaintiffs to have their bodies invaded, tainted, or otherwise impacted from unnatural medical practices that include, but are not limited to chemical cough drops instead of natural cough suppressants and natural lozenges, chemical pain relief instead of physical training, chemical mental-health medications instead of therapy and natural alternatives, and sunlight to treat Seasonal Effective Disorder, back pain, and other effects related to lack of sunlight, especially for Plaintiffs who have suffered from these problems in ad seg where some units have no light and outdoor recreation is often taken for months and years at a time and at best is only once every five to six days.

71. Defendants One, Rasul Saluki, Warren Wilcox, and John Doe prevented Plaintiffs from performing rune-yoga postures and other meditations that require access to the outdoors, the elements, plant life, and the use of a high seat with a feather-stuffed cushion, cloaks to cover their faces and bodies, full-size yoga mats, meditation pillows, and three-legged stools. Plaintiffs were neither given the space nor the aforementioned items. Plaintiffs Christie, Murphy, Lanigan, Hicks, D'Ilio, Ricci, and Johnson were deliberately indifferent after having been made aware of the situation and done nothing about it during their times of superiority.

72. Defendants One, Rasul Saluki, Warren Wilcox, and John Doe prevented Plaintiffs from performing mandatory organic plant

27

rites that require Plaintiffs to possess and sprout seeds, tend
to and be near plants, cast runes to determine which plants will
offer their parts up for sacrifices, have a mortar and pestle and
blender to liquefy the selected plants, have a group cauldron to
collect the liquefied plant offerings, have three bowls of natural
material to separate the sacred liquids, have an alter to present
them, have musical instruments for playing during the sacrifices,
have art supplies for creating items to be sacrificed, have access
to the fire god (Loki), sacred water, soil, body paint and colors,
and the other items and materials listed in the attached appendix
and other information from Organic Pagan publications.  Plaintiffs
were neither given the space nor the aforementioned items.
Plaintiffs Christie, Murphy, Lanigan, Hicks, D'Ilio, Ricci, and
Johnson were deliberately indifferent after having been made aware
of the situation and done nothing about it during their times of
superiority.

73. From September 21, 2016 through to the present, Defendants
One through Eight were responsible for and/or deliberately
indifferent to the previous and following conditions that prevented
Plaintiffs from practicing their religion, or otherwise subjected
Plaintiffs to significant burdens within the New Jersey Department
of Corrections.

74. In that time, Defendants One through Eight and Defendant
Fifteen were responsible for and/or deliberately indifferent to
Plaintiffs not being able to and/or being dissuaded from readily
and fully accessing the DOC grievance system and medical system

28

through the JPAY kiosk to advance claims and have them remedied.

75. From September 21, 2016 until his retirement sometime in or around the spring of 2017, Defendant Number Fourteen caused and/or was deliberately indifferent the following conditions of confinement at NJSP, and caused and/or was deliberately indifferent to the following conditions of confinement that prevented Plaintiffs from practicing their religion and otherwise impacted Plaintiffs within the DOC as prisoners.

76. From September 21, 2016 through to the present, Defendants Six, Seven, and Eight acted with malicious intent, and from September 21, 2016 until his retirement sometime in or around the spring of 2017, Defendant Fourteen acted with malicious intent, by allowing the following living conditions in NJSP's Administrative Segregation Unit, 7-Wing, to remain unchanged. All of said Defendants had personal knowledge of the previous and following conditions from seeing it first hand, and in some instances for Defendants Four, Six, Seven, Eight, and Fourteen having ordered it to take place and then remained deliberately indifferent after having been notified of the situations, conditions, and impacts listed in this complaint.

77. From September 21, 2016 through to the present, Defendants One, Six, and Seven have been deliberately indifferent to the previous and following conditions that were and/or are still in effect throughout the DOC system.

78. From September 21, 2016, until he was no longer Governor of New Jersey in the winter of 201°, Defendant Three was deliberately indifferent to the previous and following conditions that were in

29

effect throughout the DOC system and had been brought to his attention through legal notices and other means.

79. From September 21, 2016, until he was no longer Commissioner of New Jersey DOC sometime in or around the spring of 2018. Defendant Four was deliberately indifferent to the following conditions that were in effect throughout the DOC system after they had been brought to his attention through legal notices and other means.

80. Since taking over as Governor of New Jersey in the winter of 2018, Defendant Two was deliberately indifferent to the previous and following conditions that were in effect throughout the DOC system, after having been brought to his attention through legal notices and other means.

81. Since taking over as Commissioner of New Jersey DOC sometime in or around the spring of 2018, Defendant Five was deliberately indifferent to the previous and following conditions that were and still are in effect throughout the DOC system, after having been notified following his inauguration through legal notices and other means.

82. The following conditions and previously listed applicable conditions of confinement have resulted in cruel-and-unusual punishment in violation of the Eighth Amendment to the United States Constitution, and have violated DOC-confined Plaintiffs' religious rights under the Federal and State Constitutions, the New Jersey Torts Claims Act, and the Religious Land Use and Institutionalized Persons Act of 2000.

83. The previous and following applicable conditions of

30

confinement led to depriving Plaintiffs of being able to purify themselves, eat ritual meals, fast, read their religious literature, meditate, perform rune yoga and other ritual exercise, create religious art and writing, perform personal research rituals, have personal privacy for ritual purposes, and perform sleep-and-dream rites, which were among the only potential forms of religious activities they might have been able to perform in their cells and elsewhere if not for the following conditions.

84. In New Jersey State Prison in the town of Trenton (hereinafter "NJSP"), the Administrative-Segregation unit (hereinafter "ad seg") is subjected to, and has been subjected to extremely cold conditions since September of 2016, as a result of many windows having been broken, gaps in window jams, broken window hinges, openings in the exterior walls, lack of weather stripping, lack of insulation, open exhaust fans not being properly sealed up, and an insufficient heating system that has several sections that were either shut off or removed from the system.

85. An old heating system that was no longer working had openings that allowed air to rush in from outside in large amounts. The unit was eventually removed, and the openings were left completely open, which made it get even colder since at least September 21, 2016. It often got so cold in ad seg in Trenton that the water in the toilets froze and coffee that was placed on the shelves after breakfast would be frozen within a few hours after having been served.

86. Many of the same problems that cause the excessively cold

31

temperatures are also the causes of an insect and rodent infestation. Nothing protects the prisoners from insects and rodents entering and leaving the building at will.

87. The showers in NJSP and Northern State Prison ("NSP") ad seg were/are so hot that they could not be used.

88. During the warm parts of the year in NJSP ad seg and EJSP population and pre-hearing detention areas, there was a lack of ventilation, leading to excessive heat, which resulted in mildew and visible mold in the cells, showers, and housing units.  Clothes and bedding could not be dried, and fungal outbreaks were ubiquitous within all clothing and bedding, and on Plaintiffs bodies.

89. There are constant problems with insects and rodents within all areas of NJSP, NSP and EJSP  There are no screens and/or broken screens in all windows in the West Compound of NJSP and all parts of EJSP, and there are cracks in the walls of all parts of NJSP, NSP, EJSP, and Southwoods State Prison ("S.S.P.") where ants and other insects enter the buildings.  Bug bites are regular, and in some seasons there is never a moment when Plaintiffs do not suffer from dozens of bug bites a day.

90. Additionally, an excessive amount of food waste is thrown out of the cell doors in NJSP ad seg, where the insects and rodents are drawn.  There are long periods between prisoners in the cells being able to remove trash from their cells, and there are long periods between the trash on the ground being removed.  This contributes to the infestation.

91. Cells in the West Compound of NJSP and all areas of EJSP

have leaks in the ceilings causing rusty water and in some cases sewage to drip down onto the bunks where Plaintiff are sometimes dripped on while trying to rest or sleep.

92. Cells, bunks, gates, bars, shelves, and all surfaces in the West Compound of NJSP and all areas of EJSP are covered in rust that gets on every thing. Plaintiffs' clothes and bedding are stained with rust, and it gets in their food and eyes.

93. Other than using community laundry in the DOC, there is no place to do laundry. Buckets used to be handed out, but have not been being given out for several years and are taken upon being shipped between prisons or moved to ad seg. Laundry bags are no longer given out and must be purchased, but they are easily ripped and torn within the first three uses. Between laundry and between being able to purchase new laundry bags, there is no place to do laundry and no laundry detergent that is in keeping with Plaintiffs' religious beliefs that they must use only natural soaps and detergents. In ad seg, no state pay is given, and only $15 can be spent, so laundry bags (which cost nearly five dollars) cannot realistically be purchased.

94. There are no places in the DOC shower areas where towels and clothes can be hung, or where soap and shampoo can be set, other than the dirty floors.

95. Almost all of the showers and shower areas in NJSP, NSP, and EJSP have blocked drains or clogged drains that result in flocded shower areas where Plaintiffs are forced to either stand in water from other prisoners' shower fallout or to forgo showering.

96. Showers in ad seg are as long as three days apart, which is insufficient during hot periods, and it is the only time when Plaintiffs have access to warm water to perform their purification rituals.

97. Plaintiffs are not provided with or given the ability to purchase natural soaps and detergents in keeping with their religious beliefs, so they cannot clean their bodies, clothes, bedding, and eating/drinking containers and utensils. There is no access to natural cleaners for toilets and sinks, despite that Plaintiffs' beliefs require them to use only natural cleaners.

98. There is no access to warm water in the West compound of NJSP or most parts of EJSP, so even if Plaintiffs were provided with a bucket and natural soaps and detergents, they would not be able to rinse their bodies, clothes, and eating/drinking containers and utensils.

99. There are no lids on the toilets any place within the DOC, and the toilets in the cells splash human waste all over the cells, all over Plaintiffs, and all over Plaintiffs' bodies and belongings. This prevents Plaintiffs from ever being able to purify themselves to perform any of their religious obligations.

100. Light bulbs in the West Compound of NJSP and all over EJSP are insufficient for reading and writing personal and legal work, and as a religious claim it also prevented Plaintiffs from being able to perform their obligatory religious rites, including but not limited to personal research, writing, and art obligations.

34

101. In NJSP and NSP, recreation in ad seg is between once every five days and once every six days, respectively. This is insufficient for physical and mental health, and it is worse in the NJSP cells in 7-wing, which are approximately four and a half feet by six and a half feet, with a two-foot bunk on one wall and a one-foot shelf on the other wall, leaving approximately a foot and a half by of six and a half feet of "walking" space. There is no room in the cells for recreation, and Plaintiffs are often subjected to several months at a time and even several years at a time to life in these cells with only one yard movement per week at most. The long-term impact is detrimental to physical health and mental health. Yard movements are often canceled several times in a row due to weather, power outages, and numerous other factors.

102. The DOC has a sanction called Loss of Recreation Privileges ("LORP") that was originally used to prevent prisoners from attending incentive recreation programs for certain periods of time. While she was an acting administrator at New Jersey State Prison, Defendant Number Six changed the policy so it began being applied to general recreation movements. Since then, it is customary to give out LORP sanctions of at least 30 days in a clip, and often sanctions of 365 days LORP at one time. There are also many instances when consecutive LORP sanctions are given out, and some Plaintiffs are subjected to literally several years of no form of recreation, or so little recreation that it is not even possible for them to walk around without experiencing pain after having lost so much muscle mass and suffered such extreme back pain from being confined to

34

their bunks without actual walking or stretching space.

103. There are portions of ad seg in NJSP where no sunshine enters the cells. The first-floor areas without sunlight are referred to as "the dungeon." Being housed on the flats for 1-tier, 2-tier, 7-tier, and 8-tier for any length of time subjects Plaintiffs to a complete lack of any sunlight, including indirect sunlight, resulting in Vitamin D deficiencies, Seasonal Affective Disorder, and other physical and mental ailments. Because Plaintiffs must sometimes become vegans for religious purposes and are not given access to sunlight, they have no source of Vitamin D and their bodies cannot synthesize it without sunlight.

104. disposable spoons and forks are not sold or provided in ad seg. At best one spoon is given upon entering ad seg. After that, no others are provided, and there is no way to wash the spoon, which become stained, worn, and useless within a week.

105. In all of NJSP, only two disposable spoons are able to be purchased per month, despite that the spoons are meant for only one use. In FJSP, no spoons are sold; one is given out in the mess hall, but it is not allowed to be taken back to the cell.

106. There is no way for Plaintiffs to eat in the mess halls within the DOC because Plaintiffs religions require them to wash their hands immediately before eating, and there are no places for them to wash their hands in NJSP after they have touched contaminated doors upon entering the mess hall; moreover, Plaintiffs are not able to have access to any soap, let alone any natural soap within any of the mess halls in the DOC.

35

107. Disposable cups are not sold or provided in ad seg. At best one is given upon entering ad seg. After that, no others are provided, and there is no way to wash the cups, which fall apart within a week.

108. There are no pillows in the ad seg cells, and they are taken from Plaintiffs once they enter ad seg. This has resulted in loss of sleep as a physical injury, which has resulted in consequential mental anguish, and it has resulted in neck and shoulder pain that often does not go away at all after ad seg.

109. The mattresses in all of the prisons within the DOC and especially within ad seg in NJSP, NSP, and EJSP are so worn out that sleep is nearly impossible, constantly being on the buns causes long-lasting severe pain in Plaintiffs' backs, hips, necks, and knees. Mattresses are not replaced often enough.

110. There is no safe place to sit in any of the cells in the DOC. Aside from this being a claim in and of itself because it has resulted in permanent slouching and neck and back pain, it is also a religious claim because Plaintiffs are required to sit in a high chair for one religious rite, on a three-legged stool for another rite, and on a meditation pillow for another rite.

111. There is no room in the DOC cells where Plaintiffs can perform Rune Yoga, which they must do every day, and which requires them to be able to stretch their bodies all the way out on full-size mats that are the same length as their bodies and outstretched hands. Plaintiffs are not given time and space outside their cells or access to yoga mats to perform these rites.

36

112. There is no place to write, paint, and draw in any of
the cells in the DOC. Plaintiffs are required to perform rites
that involve writing, painting, and drawing for long periods of
time every single day, but this is not possible in any of the cells,
and Plaintiffs are not given the ability to leave their cells to
perform these rites in any other places. In contrast, Jewish inmates
are permitted to leave their cells at least five times a week at
EJSP and in some instances more often to perform Jewish rites.
Aside from being claims by themselves, these are advanced as claims
of disparate treatment regarding these issues and the previous claims
related to the aforementioned daily rites for each of the days of
the weeks and the different rites for the deities the days of the
week are named after.

113. There is no place to eat in the cells in the DOC, despite
that Plaintiffs are often confined to and therefore required to
eat within their cells for long periods. In ad seg, Plaintiffs
are forced to eat on their bunks with no place other than their
laps and mattresses to place trays that are almost always covered
in spilled food. Sheets are washed only once a week at best, and
often this is not even possible when there is no access to a laundry
bag to get the sheets washed even if Plaintiffs were to go against
their beliefs and let their bedding be further contaminated by other
people's soiled bedding and toxic detergents and chemically treated
water. Blankets are washed only every six months. Between washings,
blankets and sheets are covered in food debris and splashes from
the uncovered toilets for months at a time.

37

these problems, pain, and ailments, Defendant Thirteen refuses to treat Plaintiffs with natural remedies that are in agreement with Plaintiffs' religion.

117. When the statutes, policies, and procedures for Administrative Segregation within the DOC were approved, conditions were completely different. Now, it is atypical confinement, but the cumulative impact of long-term ad seg sanctions is still enforced despite that the due process protections for handing out said sanctions have been lessened rather than heightened.

118. The DOC changed its policy on how long Plaintiffs can be subjected to ad seg, but they did not change the ability to stack on consecutive sanctions that equal out to being much longer than what the DOC defendants already now to be detrimental to physical and mental health, and they did not ensure that at least two Plaintiffs who had already been in ad seg for longer than the time considered to be safe were not removed or entered into a step-down program or had their cumulative times amended, or ensured they were released or evaluated for physical and mental damage after the extensive stays, despite that most of these measures were taken for other prisoners.

119. There is excessive noise in ad seg in NJSP, and there is no way for Plaintiffs to ever meditate or perform personal research rites, and no way for them to sleep. Longterm exposure to the excessive noise of ad seg over the course of several months and longer has led to physical dages of lost sleep, and consequential mental suffering.

120. The administration at NJSP pays for cable television
packages that have several choices of educational and entertainment
stations. The defendants who and are in charge of the prison fail
to provide all of the stations that are available. They omitted
educational stations in place for Christian and Jewish religious
stations, despite that there are no attempts to provide religious
programming for Plaintiffs.

121. Plaintiffs are deprived of the ability to purchase safe
toothbrushes and flossing materials or have access to them. Oral
hygiene is a mandatory part of Plaintiffs' sincerely held beliefs,
as they believe the god Thor died from smelling the foul breath
of the World Serpent, and they believe bad breath impedes their
ability to reach full states of meditation. Throughout the DOC,
there is only one toothbrush that is manufactured for the purpose
of being used more than one time. It is a soft-bristled security
brush that is flexible and has a short handle. It is given out
to prisoners when they first enter into Bayside State Prison. This
toothbrush is not sold anywhere and is not provided anywhere else
in the prison. The only toothbrush sold is the same size but it
is meant for only one use, it has hard bristles, and it is dangerous
even on the first use because it scrapes gums due to the stiff
bristles. After more than one use, its bristles become splayed
and they cut into the gums. The handle is not flexible, and the
company that makes the toothbrush has stated that it is not made
for more than one use. Nevertheless, all prisons other than Bayside
State Prison provide the dangerous version upon entry, and the only

40

toothbrush for sale throughout the DOC is the dangerous one. In most areas of the prisons, there is a limit as to how many toothbrushes can be ordered and it is as little as two per month in NJSP ad seg and ten per order in EJSP population. This allows for only a limited amount of times that the dangerous toothbrush can be used as it is intended, and leaves Plaintiffs unable to brush their teeth anywhere near as often as recommended by the American Dental Association ("ADA"). Additionally, the ADA recommends flossing at least once a day, but this is not possible or is costly throughout the DOC. In NJSP, no form of floss is sold or provided. In NSP and EJSP, dental loops are sold at costly prices. Defendants One through Seven are deliberately indifferent to this problem or are responsible for it, and Defendant Rutgers deprives Plaintiffs of dental cleanings as often as recommended by the ADA, which states that it should be done every six months. Rutgers provides dental cleanings only once every two years, and it fails to provide dental hygiene products. The short-term impact is bad enough, but the long-term impact for Plaintiff Castaldo and many of the other Plaintiffs who are serving several decades behind bars has resulted in permanent damage to Plaintiffs' teeth and gums.

122. Plaintiffs believe they must perform religious practices "in lieu of the Most-Sacred Rites." For thousands of years, the most-sacred rites for pagans involved preparing for war or for the hunt, the exercise of war or hunting, and the calming-down rite of the so-called "warrior's repose" (that is, copulation with a member of the opposite sex). Plaintiffs believe replacing these

41

rites in the prison system is necessary in order for ⁿ      ⁱⁿ ⁱⁿ
to attain spiritual balance. In modern times for mature adults
in the free world, war is no longer practiced, but it is replaced
with exercise for Organic Pagans. The rite of hunting is still
practiced by pagans, but it obviously cannot be practiced for
Plaintiffs in the prison system. Plaintiffs within the prison system
are not asking to be able to go to war, hunt, or have sexual contact
with members of the opposite sex. Instead, they are asking to
replace war with and hunting with exercise, and to replace the rite
of sexual intercourse with private space and private time with
stimulating images to gain release for religious and health purposes.

123. Plaintiffs have been subjected to removal of tobacco from
the DOC without being given any treatment to deal with the withdrawls
they experience, and nothing has been done by the DOC and State
staff, or those notified, or Rutgers to address this matter, which
is still going on every time Plaintiff see cigarettes on the
television and smell smoke on staff.

## JPAY-Related Claims

123. Defendant Number Fifteen has installed kiosks throughout
the prison system. Plaintiffs are limited to only one 20-minute
session each time they are granted the ability to use the kiosk,
which Plaintiffs must use in order to access the DOC grievance
system, check their e-mails, check their prison accounts, sign up
for programs, submit sick-call requests and other medical requests,
access the news stand, order and download music and books, and enter

42

JPAY trouble tickets.

125. In most instances, Plaintiffs are limited to only one or two 20-minute kiosk sessions per week, and sometimes less than that. Plaintiffs often have to forfeit recreation, mess movements, and religious study groups or other such passes in order to access the kiosk system, which further interferes with grievances, etc.

126. Defendant Number Fifteen's Kiosk program allows access to DOC grievance system. Plaintiffs often have problems using the grievance system because the kiosks are frozen or otherwise not in working order. When the kiosks are in working order, the system often fails to record what was typed, and instead provides a notice explaining that the grievance filing was not entered into the system. The kiosks often freeze for several minutes in each session leaving only a very small amount of time to use the grievance system.

127. Plaintiffs must choose between accessing the grievance system or check their e-mails, check their prison accounts, sign up for programs, submit sick-call requests and other medical requests, access the news stand, games, and card orders, order and download music and books, enter JPAY trouble tickets, and so forth.

128. Even if Plaintiffs were to forego using the other options on the kiosk and devote their short 20-minute sessions exclusively to accessing the grievance system, some of this time must be spent reading the previous responses from prior submissions, so the time is limited.

129. The administrations at NJSP, NSP, and EJSP rarely (if ever) answer hard copies of inquiries, grievances, appeals, and

43

medical slips, and restrict almost all of their responses to the
entries that are submitted on the kiosks.

130. In many instances, especially in ad seg, hard copies of
the inquiry, grievance, appeal, and medical slips are even handed
out by staff members.

131. Consequently, the grievance and medical systems are limited
as a result of there not being enough kiosk machines, the machines
often being down, Plaintiffs being provided insufficient time to
use the kiosks, Plaintiffs being dissuaded from using the kiosk
for only grievance and medical issues, staff members failing to
hand out and answer hard copies of grievance and medical forms,
and the administrative and downtown DOC defendants being deliberately
indifferent to these issues.

132. Defendant Fifteen advertised a JP5 player ("tablet") to
Plaintiffs. The advertisement claimed the tablet would come with
a power cord and would offer an FM-stereo function. After Plaintiffs
had purchased the tablets, they realized there was no power cord
and there was no reception on the FM-stereo function. Consequently,
the only way for Plaintiffs to use the tablet is to pay for batteries
and purchase music, etc. Plaintiffs are limited to only a certain
amount of batteries they can purchase, so they are limited as to
how often they can use this product after the bait-and-switch sales
tactics had been achieved.

133. The only batteries provided by Defendant Fifteen and sold
in the DOC are non-rechargable, and these batteries state on their
sides on the packages that they will explode if they are charged.

44

The kiosks charge the batteries when they tablets are hooked up for downloading, and Plaintiffs must download frequently in order to prevent the tablets from shutting down. As a result, the batteries often rupture and leak battery juices into the tablets, causing them to stop working. Additionally, if new batteries are in the tablets when they are hooked up to the kiosks, the power from the batteries and form the charge the kiosks provide combine to equal too much power for the tablets, which results in the tablets being overloaded and not working.

134. Defendant Fifteen has a warrantee for their tablet and headphones that cannot be read until after the product has been purchased, and there is no notice of how to operate the tablet or access the warrantee information.

135. It takes several weeks and sometimes months for Defendant Fifteen to approve replacing tablets and sending them when it is within the warrantee period. During long periods when Plaintiffs have been without their tablets, they have not been able to access the music and other options they paid for, and they must use their short 20-minute kiosk sessions to read their e-mails, address the JPAY trouble-ticket issues, and otherwise not have time to access the grievance and medical systems on the kiosks.

136. Some Plaintiffs have had several tablets explode and have gone several months without tablets while waiting to get replacements and/or waiting to afford to purchase new tablets when Defendant Number Fifteen claims the warrantees have run out.

137. Plaintiffs have been injured as stated in this complaint

45

and the attachments, and as inferred.

138. Plaintiffs seek relief in the form of a preliminary injunction ordering Defendants to 1) grant Plaintiffs in the DOC equal time and space for outdoor religious services, allow Plaintiffs to temporarily order and pay for their own organic food, pure spring water, natural soap and detergent, meditation mats and pillows, and the other items and means necessary for Plaintiffs to perform ritual purification and their other rites as described in the attached appendix, and 3) allow Plaintiffs to either be placed in single cells or to have options to choose cellmates who practice the same ritual hygiene laws and don't display crosses and other hate symbols or sing any oposing religious songs that interfere with Plaintiffs' ability to meditate in peace and live in a metaphysically clean living area. Plaintiffs also seek a temporary restraining order preventing Defendants from shipping any of the Plaintiffs out of EJSP as threatened by Defendant Flever. Plaser also seek injunctions and declaratory relief that allows them to practice their religion as described in this complaint and their Organic Pagan literature. Plaintiffs additionally seek punitive relief, compensatory relief, nominal relief, and any other relief available.

139. I hereby certify that the foregoing claims are not the product of any other case or controversy surrounding the facts of this case from September 21, 2016 until present. I also certify that the foregoing statements made by me are true and correct. I understand that I am subject to punishment if any of the foregoing

46

statements are willfully sworn false.

Dated: September 20, 2018

_____
Frank Castaldo, Plaintiff One